CHARLOTTE THEATRES, INC., Plaintiff,

v.

THE GATEWAY COMPANY, INC., Defendant and Third-Party Plaintiff,

v.

VALLEY ELECTRIC AND HEATING SERVICE, INC., Third-Party Defendant.

Civ. A. Nos. 59–680, 59–681.

United States District Court
D. Massachusetts.

March 1, 1961.

Nicholas Zeo, Jr., Theodore E. Di-Mauro, Harold R. Matroni, Nicholas Zeo, Jr., Theodore E. DiMauro, Springfield, Mass., for plaintiff.

Cohn, Riemer & Pollack, Jerome Medalie, Boston, Mass., for Gateway Co.

S. Thomas Martinelli, Springfield, Mass., for Valley Electric & Heating Service.

JULIAN, District Judge.

In these two actions, which were tried together, the plaintiff, Charlotte Theatres, Inc., seeks damages for breach of an agreement contained in a lease, cancellation of the lease, the return of its deposit, and the recovery of money expended by it in the performance of its agreements under the lease.

Jurisdiction of these cases, which were removed to this Court under 28 U.S.C. § 1441(a), is founded upon diversity of citizenship and the requisite jurisdictional amount.

The defendant, The Gateway Company, Inc., a Connecticut corporation, owned the Park Theatre in Westfield, Massachusetts.

The plaintiff leased the Park Theatre from Gateway under an indenture dated November 28, 1958, for a term of ten years beginning December 1, 1958, and covenanted and agreed "to use the demised premises as a theatre for the exhibition of motion pictures and/or theatrical entertainment as is usual and customary in motion picture theatres and/or for such other purposes as are usual and customarily allied with the exhibition of motion picture or stage entertainment in theatres." The agreed minimum guaranteed annual rental was $7,500 payable in equal monthly installments of $625. In addition to the minimum guaranteed rental, the plaintiff agreed to pay, as rent, a further sum equivalent to 5 per cent of all gross admissions, and certain other sums not in issue in these cases.

The Park Theatre is located on the main street of Westfield and has a seating capacity of 1200. At the time it was leased to the plaintiff the theatre was not air-conditioned. There was only one other moving picture theatre in Westfield, the Strand Theatre, one of a chain of 13 operated by a theatre management corporation. The Strand has a smaller seating capacity than the Park and is located about 400 feet away from it on a side street. The Strand was air-conditioned.

The lease was executed in behalf of Gateway by a Mr. Heyman who was its president and the officer in charge of its business. Heyman represented that corporation in all its dealings with the plaintiff and with Valley Electric and Heating Service, Inc., the third-party defendant in these cases. He is an experienced lawyer who is not engaged in active practice but has been dealing for a number of years in real estate and other investments for himself and his family. The lease was prepared by him and the language in the typewritten parts of the lease, which include the clauses involved in this litigation, is his language.

Simultaneously with the execution of the lease, the plaintiff paid Gateway the sum of $7,500 which, according to clause 41 of the lease, was to "be held as rent security by the landlord" and returned to the plaintiff at the expiration of the lease or renewal thereof "in the event of the full and faithful performance by the tenant of the covenants of the lease."

Gateway agreed in the lease to install an air conditioning system in the Park Theatre on or before May 1, 1959.[1]

The plaintiff agreed to make certain improvements and repairs to the leased premises at its own cost and expense before March 1, 1959. It agreed to replace worn carpeting, install a new marquee with neon lighting and removable lettering, build a new concession stand, and repair and re-cover seats where necessary. It is not disputed that the plaintiff did all these things.

The plaintiff took possession of the theatre on December 1, 1958. The interior of the building required extensive reconditioning. The lobby, the lower half of the interior of the theatre, the hallway leading from the lobby to the theatre, the ladies' lounge, the men's room, and the walls of the stairways leading to the balcony were washed and painted in December, 1958, at a cost to the plaintiff of $1,477. No evidence was introduced by either the plaintiff or Gateway tending to show the condition of the theatre on or about August 4, 1959, when the plaintiff filed its bill in equity to cancel the lease, or thereafter. Worn carpeting was replaced and repairs and alterations were made in the lobby. A new concession stand was built. A substantial number of seats, estimated at about 40 per cent of the total, were in a damaged condition. These were repaired or replaced. No evidence, however, was offered of the cost or value of these items.

In December, 1958, the plaintiff installed a new marquee with neon lighting and removable lettering at a cost of $2,311. The marquee was specially designed and constructed for the Park The-

[1] "Twenty-eighth.—Landlord shall, on or before the 1st day of May, 1959, at its own cost and expense, cause the demised premises to be air-conditioned * * *."

atre. It would cost about $150 to remove it and its salvage value would be only $15.

Gateway failed to install an air conditioning system in the Park Theatre on or before May 1, 1959. No system was installed until more than three months after that date.

In its third-party complaint Gateway alleges that "due to unforeseen difficulties, the third party plaintiff [Gateway] was unable to accomplish the installation of an air conditioning system prior to May 1, 1959." The allegation is groundless. There were no difficulties of any kind. The failure by Gateway to install air conditioning within the time required by the lease was not due to inadvertence or oversight. It was due to a wholly inexcusable disregard by Gateway of its obligation under the lease.

On April 15, 1959, a Mr. D'Arcy, president and officer in charge of the business of Valley Electric and Heating Service, Inc., got in touch with Heyman and submitted a proposal for the installation of an air-conditioning system in the Park Theatre. The proposal was the same as the one submitted to Heyman by Valley in May, 1958, and not acted on by Gateway. On April 22, 1959, Heyman wrote D'Arcy stating that the specifications seemed incomplete and asking for additional information.

On April 23, 1959, the plaintiff wrote to Gateway, stating:

"In accordance with the terms of your lease * * * you were to install air conditioning on the demised premises on or before May 1, 1959. * * * [L]et us know if you have made arrangements to air condition this theatre."

To this inquiry the defendant replied on April 28, 1959:

"We are considering several proposals for the installation of an air conditioning system * * * and expect to let this contract shortly.

"The installation which seems best to us * * * was submitted by

Valley Electric & Heating Company, East Longmeadow, Massachusetts, * * * Do you know this firm and are they responsible and reliable?"

There was no evidence that any other proposals had been submitted to Gateway. Heyman had had dealings with Valley during the preceding year and knew whether or not it was a reliable firm. The plaintiff in its letter to Gateway dated May 7, 1959, stated that it found Valley to be a reliable concern and one that could install the air-conditioning system.

Three weeks later, on May 29, the plaintiff wrote Gateway, stating:

"Mr. George Shenas informed me today that nothing has been done in regard to the installation of air conditioning in the Park Theatre in Westfield. In view of the fact that we have had considerable hot weather lately, the box office receipts have dropped substantially.

"We believe that if we had air conditioning we would have done considerably more business during the last few weeks. In accordance with the terms of our lease, air conditioning was to be installed on or before May 18 [sic], 1959.

"I would appreciate it if you would communicate with this office in regard to this matter."

Shenas was the general manager of the Park Theatre from January 1, 1959, to the end of May, 1959.

May of that year was warmer than usual and a large proportion (estimated at 40 to 50 per cent) of the patrons who attended the Park Theatre complained about the heat and the lack of air conditioning. Receipts from admissions dropped from an average of $3,955 for the preceding four months to $2,239 for May.

In its advertising the Strand was publicizing the fact that it was Westfield's only air-conditioned theatre. Westfield, a municipality with a population of

20,962,[2] is about 10 miles away from Springfield, a city with a population of 162,399.[2] The moving picture theatres in that city were air-conditioned. Good roads connect the two municipalities.

U. S. Weather Bureau reports were put in evidence showing the daily average maximum and minimum temperatures at the Springfield Armory, Springfield, Massachusetts, for the months of May, June, July, and August, 1959. It was agreed that the temperatures in Westfield were about the same as those in Springfield. In May there were 13 days in which the temperature rose to 80° F. or higher; the average maximum temperature for the whole month was 77.3°; the average maximum temperature for the last two weeks was 83.5°. In June there were 17 days in which the temperature was 80° or higher; the average maximum temperature for the month was 78.8°. In July the temperature reached 80° or higher on 27 days; the average maximum temperature for the month was 85.3°. The temperature on each of the first four days of August was 80° or higher and the average for the four days was 85.3°.

Again, on June 2, 1959, the plaintiff complained to Gateway, writing,

"* * * Mr. Shenas informed me that during the last few weeks, box office returns have dropped considerably. He attributes part of this to the fact that patrons have been complaining of the fact that the theatre is not air-conditioned.

"In accordance with Paragraph No. 28 of our lease with you, it was agreed that air-conditioning was to be installed on or before May 1, 1959. On this basis, we deposited $7500.00 in advance with you.

"I would appreciate it if you would communicate with this office at this time in regard to this matter."

On June 4, 1959, Heyman, replying for Gateway, informed the plaintiff that it had awarded the contract to Valley, and then stated, "Mr. D'Arcy, the president of Valley Electric, assures me his installation will be completed not later than June 22, and I hope you will bear with us until that date." No such assurance had been given by D'Arcy or anyone else. The statement was untrue and Heyman knew it was untrue when he made it.

In its letter of June 5, 1959, the plaintiff notified Gateway that its failure to install air conditioning constituted a substantial breach of the lease, stating:

"During the last five weeks, our box office returns have been cut in half and we attribute this decline to the fact that the theatre does not have air conditioning for the comfort of the patrons.

"As I informed you in my letter of June 2, 1959, we leased the Park Theatre with the expectation that we were to have air conditioning on or before May 1, 1959. In your letter of June 4th, you stated that air conditioning would be installed no later than June 26 [sic], 1959. In view of the fact that our competitor, the Strand Theatre, has been advertising in the newspaper that it is the only air conditioned theatre in Westfield, we feel that we are going to continue to sustain substantial losses in the operation of our theatre.

"I am enclosing advertisement which appeared in the newspaper for both theatres on May 27, 1959. In its advertisement, the Strand Theatre mentioned the fact that it was the only air conditioned theatre in Westfield.

"It is our opinion that your failure to install air conditioning in accordance with the terms of the lease constituted a substantial breach. As a result of this breach, we have been considerably damaged. We, therefore, would appreciate the opportunity to discuss the situation with you at this time."

2. 1950 census.

Replying on June 10 to the foregoing letter, Heyman stated to the plaintiff:

"The delay is caused by our taking the time to get you the very best air conditioning system possible. * * * We are mindful of your problem and have asked Mr. D'Arcy of Valley Electric to work overtime, if necessary, in order to get this system functioning completely prior to June 26. * * * I would appreciate it if you would forget the claim for damages due to breach of contract. * * *"

The delay was not caused by taking the time to obtain the very best air-conditioning system possible, but by the prolonged and inexcusable failure on the part of Gateway to take affirmative action to perform its agreement.

D'Arcy was not asked to work overtime, if necessary, to complete the installation by June 26, or by any other date.

On June 4, 1959, D'Arcy called Heyman on the telephone and discussed with him several matters relating to the proposed contract between Valley and Gateway for the installation of the air-conditioning system in the Park Theatre. Nothing was said about a completion date. After the discussion and on the same day, D'Arcy prepared the agreement, signed and sealed it in behalf of Valley in the presence of a witness, and mailed it to Heyman. The agreement provided for the furnishing and installation of specified equipment for a complete air-conditioning system at the Park Theatre for the price of $15,500 payable in two installments of $7,750 each, the first upon delivery of the equipment, the second upon completion of the installation.

The agreement contained no completion date.

After receiving the agreement, Heyman caused to be inserted therein the following sentence:

"This installation shall be fully completed and in operation on or before June 22, 1959."

He then signed and sealed the agreement in behalf of Gateway and mailed it back to Valley, with a brief covering letter, on Friday, June 5. It was received in Valley's office on the following Monday, June 8. The letter was addressed to Valley, attention of D'Arcy, and reads as follows:

"I am enclosing signed copy of contract for installation at Westfield. It is my understanding that this installation is to be completed so that it is in full operation by June 22."

D'Arcy's secretary informed him that the agreement had been received. D'Arcy asked her if it was signed, and upon being told that it was, he instructed her to file it. She filed both the agreement and the letter. D'Arcy saw neither the returned agreement nor the letter, and was unaware of the insertion made by Heyman. The first time D'Arcy learned that a completion date had been added to the agreement or was being claimed by Gateway was about October 1, 1959, after the work had been completed. The sentence containing the completion date was inserted in the agreement by Heyman without the authority or knowledge of D'Arcy or any other person connected with Valley. There was no reason for D'Arcy or for anyone associated with Valley to believe or suspect that any changes or additions would be made to the agreement without permission. Heyman testified that he obtained D'Arcy's permission before he added the sentence in question. I do not believe him. He never asked for and never obtained such permission. No completion date was in fact agreed upon between Valley and Gateway.

The installation of the air-conditioning system required equipment that was not in stock and that had to be specially ordered and manufactured. Delivery would take from four to six weeks after the order was placed with the manufacturer. Valley placed the order on June 8, the same day the agreement was received from Heyman. An estimated additional three weeks would be needed to install the equipment after it was de-

livered. In all, from four to five tons of equipment were used in the installation.

Valley made every reasonable effort to obtain delivery of the equipment as soon as possible. Equipment arrived on July 21, and one large item on July 27, 1959. On August 7, 1959, the air-conditioning system was operational. The work of insulating the piping and making adjustments continued to September 14, 1959, when the installation was fully completed. Valley commenced and prosecuted the work with reasonable diligence and without unnecessary delay, and satisfactorily completed the installation within a reasonable time. While the work was in progress, Heyman, who kept in touch with it, never mentioned June 22 or any other date as the completion date and did not complain about any delay.

By writ dated June 18, 1959, returnable August 3, 1959, the plaintiff commenced an action at law in the Massachusetts Superior Court against Gateway to recover damages for breach of its agreement to cause the Park Theatre to be air-conditioned. This is one of the two actions removed to this Court, and is Civil Action No. 59–680–J.

On August 4, 1959, a suit in equity was begun by the plaintiff against Gateway, also in the Massachusetts Superior Court, alleging failure to install air conditioning and seeking the cancellation of the lease, the return of the money spent by the plaintiff in remodeling and renovating the leased premises, the payment of losses sustained by the plaintiff in the operation of the theatre, and the return of the $7,500 paid to Gateway "as rent security." Service was made on the Commissioner of Corporations and Taxation in accordance with Mass.Gen.Laws, c. 181, § 3. Gateway received actual notice of the pendency of this suit on August 12, 1959. This action was also removed to this Court and became Civil Action No. 59–681–J.

On December 14, 1959, after the removal of the cases to this Court, Gateway filed in each case a third-party complaint against Valley alleging failure by Valley to have the air-conditioning system fully completed and in operation before June 22, 1959, as it had agreed to do in the written agreement of June 4, 1959, and seeking to recover judgment against Valley for all or a portion of the damages and costs that may be awarded to the plaintiff in its case against Gateway. In Civil Action No. 59–681–J, Gateway, in its third-party complaint, further seeks to recover judgment against Valley for damages sustained by Gateway by reason of the premature cancellation of the lease.

On March 29, 1960, Gateway filed in each case a counterclaim to recover rent allegedly owed by the plaintiff to Gateway under the lease, namely, 5 per cent of the gross admissions for December, 1959, and the monthly rent of $625 plus 5 per cent of the gross admissions for January, February, and March, 1960.

The plaintiff's gross receipts from admissions in the first four months of 1959 were as follows:

| | |
|---|---|
| January | $ 4,138.80 |
| February | 4,263.75 |
| March | 3,823.40 |
| April | 3,594.25 |

The total for the four months was $15,820.20 and the average for each of the four months was $3,955.05.

For the next succeeding four months the gross receipts from admissions were as follows:

| | |
|---|---|
| May | $ 2,239.60 |
| June | 2,660.70 |
| July | 3,015.50 |
| August | 3,275.30 |
| Total .... | $11,191.10 |

The average for each of these months was $2,797.77.

The Park was operated at a profit only during the months of January and February, 1959.

The average monthly gross receipts from admissions for the months of September, 1959, through March, 1960, were $2,469.77.

Prior to March, 1959, the Park operated under a system of film distribution whereby recent major studio releases were distributed to both the Park and the Strand without competitive bidding. The plaintiff terminated this arrangement late in February. Thereafter both theatres bid for their films. Evidence was introduced by Gateway to show that the drop in attendance at the Park Theatre in May and thereafter was due to the fact that Park exhibited old pictures and re-runs of films previously shown at the Strand Theatre. This was only partly true and constituted a minor contributing cause of such drop.

The primary cause, however, of the drop in attendance, and therefore in the amount of gross admissions, in May, June, July, and August was the lack of air conditioning and the consequent inability of the Park to attract patrons in larger numbers. This same cause also substantially impaired the Park's ability to compete with the air-conditioned Strand and the air-conditioned moving picture theaters in nearby Springfield. The diminished revenue also made it financially more difficult for the plaintiff to bid successfully against the Strand for the more expensive films. As a result of Gateway's failure to install air conditioning, the plaintiff during the period beginning May 1 and ending August 4, 1959, sustained a probable diminution of $3,600 in gross receipts from admissions. A sum equivalent to 5 per cent of $3,600, or $180, should be deducted as additional rent that would have been payable to Gateway. It is estimated that the maximum cost of operating the air-conditioning system during the same period would have been about $1 for every hour of full operation. During that period there were 19 days out of a total of 96 when the maximum temperature was 72° or less and when, it is assumed, the system would not have been in use. On the other 77 days its operation would have been intermittent. Though the evidence on the point is meager, it is estimated that the total cost of operating the system during the period in question would have been $700. Under the lease the cost of operating the air-conditioning system, had it been installed, would have been chargeable to the plaintiff. Except for this added expense, the total cost of operating the theatre was substantially the same as it had been during the first four months of the year. After making due allowance for this item and for 5 per cent of the loss in gross admissions, the estimated damage to the plaintiff from the reduced patronage caused by Gateway's failure to install air conditioning during the stated period was $2,720.

No evidence was introduced to show what losses, if any, were sustained in the operation of the concession stand.

No issue of future damages to the plaintiff by reason of Gateway's breach was raised at the trial.

Air conditioning is a factor of vital importance in the operation of indoor moving picture theatres in the inland areas of this region during the warm-weather months. At the time of the execution of the lease and thereafter, Gateway knew that with the advent of warm weather an air-conditioning system would be indispensable to the proper operation of the Park Theatre and that the lack of it would expose the theatre to serious loss of patronage and good will. Failure by Gateway to install air conditioning for an unreasonably long period of time deprived the plaintiff of an essential part of what it bargained for and was entitled to receive under the terms of the lease.

The plaintiff manifested its election to treat Gateway's default in effect as a constructive eviction when it filed its bill in equity in the Superior Court on August 4, 1959. It abandoned its occupation of the premises on April 1, 1960, because of Gateway's breach. Receipt of Gateway's notice of March 14, 1960, to quit the premises in fourteen days for nonpayment of rent merely precipitated the abandonment.

The lease required the minimum guaranteed rent of $625 to be paid in adavnce on the first day of each month. The sum equivalent to 5 per cent of the gross

admissions received for the preceding month was payable within five days after the end of that month. The plaintiff made payments to Gateway by checks dated August 1, September 1, October 1, November 25, and December 1, 1959. The August check was in the amount of $775.79 and comprised $625 for August and a sum equal to 5 per cent of the gross admissions received during July. On the back of the August check the plaintiff wrote the following before delivery:

"For use and occupation and not as rent, and not waiving any rights under breach of lease by lessor."

Gateway endorsed the check "For Deposit The Gateway Company Westfield." Each of the other checks had a similar inscription on the reverse side to the effect that the payment was for "use and occupation and not as rent for" the Park Theatre. The checks were endorsed for deposit by Gateway without qualification. By letter dated September 14, 1959, Gateway, by Heyman, notified the plaintiff that it rejected the assertion that the checks were "in payment for use and occupation and not as rent," that the lease was still in effect, and that acceptance of the checks was not to be construed as a waiver of its position that the lease was still in effect. Each check was for an amount consisting of $625 and 5 per cent of the gross admissions received during the preceding month. The plaintiff made no payment on account of rent or for the use and occupation of the premises for the months of January, February, and March, 1960. Sometime during December, 1959, the plaintiff informed Heyman that it could no longer continue to operate the theatre and wanted to vacate it. Heyman asked the plaintiff to stay on, because, as Heyman testified, it would be difficult to lease a vacant theatre. Heyman indicated that Gateway might be willing to take an amount equal to 20 per cent of gross admissions in lieu of the rent reserved in the lease if the plaintiff continued to operate the theatre until a new tenant could be found, and, further, that he would submit this proposal to the plaintiff in a letter. No letter was sent.

On March 14, 1960, Gateway gave the plaintiff the 14 days' written notice to quit mentioned above.

Gateway re-let the Park Theatre to another tenant under a ten-year lease effective on or shortly after April 1, 1960, providing for an annual minimum guaranteed rental of $7,500 payable in equal monthly installments of $625. The new tenant also agreed to pay as rent at the end of each year a further sum equivalent to 5 per cent of gross admissions in excess of $52,000. The lease does not provide for rent security.

In the absence of controlling evidence to the contrary, the measure of the fair value of the use and occupation of the premises for January, February, and March, 1960, is found to be the same as the measure adopted by the plaintiff itself for the months of August through December, 1959, namely, $625 per month plus 5 per cent of the gross admissions received for the preceding month, except that 5 per cent of the gross admissions for March, 1960, will also be added for the use and occupation of the premises for that month. The gross admissions for December, 1959, and for January, February, and March, 1960, totaled $8,825.65. Accordingly, the total amount owed by the plaintiff to Gateway for the use and occupation of the premises in question is $2,316.28, consisting of $625 per month for three months plus 5 per cent of $8,825.65.

There was no accord and satisfaction between the plaintiff and Gateway as alleged in the latter's answer; nor, as Gateway further alleges, did the plaintiff, for consideration paid, waive any rights which it may have had to the cancellation of the lease or to the other relief that it seeks in these actions. There was no waiver by the plaintiff with or without consideration. In October, 1959, Heyman, counsel for Gateway, and a representative of the plaintiff conferred in an attempt to adjust and compromise the plaintiff's claims. They failed to reach agreement.

In paragraph 5 of its third-party complaint Gateway alleges that the "plaintiff had agreed to waive all damages which it may have suffered prior to June 22, 1959, on condition that the air-conditioning system was in full operation by that date." The plaintiff never agreed to waive any damages on any condition, and has never in fact waived any damages.

■ The law to be applied in the decision of these cases is the law of Massachusetts. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

■ Gateway's wholly inexcusable failure to install an air-conditioning system on or before May 1, 1959, as required by the lease, and for a period of more than three months following that date was a material breach of the lease so serious in its nature and so prolonged in its duration as to have deprived the plaintiff of what Gateway knew the plaintiff must have in order to use the premises for the purposes for which they were leased. In the circumstances the plaintiff was justified in refusing to go on with the lease and in treating the landlord's failure as a constructive eviction. The case of Shindler v. Milden, 1932, 282 Mass. 32, 184 N.E. 673, 674, an action of contract for rent, involved a lease for a term of three years beginning April 1 of premises containing no heating system which were to be used for the purpose of conducting a restaurant business. The lease required the lessor to install a heating system in the premises on or before September 1. The lessor failed to install any heating system and the lessee, being unable to do business as the weather grew cold, moved out on November 20. It was held that "the evidence warranted the finding of the jury that there was a constructive eviction. The premises were unfit for the intended use in our climate without the heating system which the plaintiff covenanted to furnish and which was included in the thing for which rent was to be paid. The deliberate failure of a landlord to perform a covenant of the lease to furnish something essential to the enjoyment of the leased premises may be found to be an eviction."

In Westland Housing Corp. v. Scott, 1942, 312 Mass. 375, 44 N.E.2d 959, actions of contract to recover rent, the landlord, on December 7, 1936, installed an oil burner to improve the heating conditions in the premises. The burner was defective in its operation and caused smoke and soot to come into the tenant's apartment. The tenant, in reliance upon the unfulfilled promises of the landlord to remedy the situation, remained in occupation of the premises until February 16, 1937. The fact that the tenant remained in the apartment for over two months in the expectation of promised relief was held not to preclude a finding of constructive eviction.

■■ Although at law the tenant's abandonment of the leased premises must take place within a reasonable time after the acts or omissions claimed to constitute constructive eviction, such abandonment is not essential to seeking equitable relief. "Such relief is more nearly adequate than the incomplete and hazardous remedy at law which requires that the lessee (a) determine at its peril that the circumstances amount to a constructive eviction, and (b) vacate the demised premises, possibly at some expense, while remaining subject to the risk that a court may decide that the lessor's breaches do not go to the essence of the lessor's obligation." Charles E. Burt, Inc. v. Seven Grand Corp., 1959, 340 Mass. 124, 163 N.E.2d 4, 7. The plaintiff's prayer that the lease be cancelled, even though it had not abandoned the premises at the time of the filing of the bill, can reasonably be construed as an election to abandon because of a constructive eviction. Id., 163 N.E.2d at page 7.

■ Since the plaintiff was justified in treating Gateway's default as a constructive eviction and abandoned the premises because of such eviction, the plaintiff was relieved of its obligations under the lease, including the obligation to pay rent. It follows that Gateway must repay to the plaintiff the amount of

$7,500 which the plaintiff paid to Gateway at the time of the execution of the lease as security for the payment of rent. Prior to its constructive eviction the plaintiff had fully and faithfully performed all its covenants under the lease.

The plaintiff is also entitled to recover compensatory damages for losses caused by Gateway's breach of its agreement and for expenditures reasonably made by the plaintiff in the performance of its agreements prior to the constructive eviction. In fixing these damages the general purpose of the law is to put the plaintiff in as good a position as he would have been had the defendant kept its contract. Snelling v. Dine, 1930, 270 Mass. 501, 170 N.E. 403; Williston on Contracts (Rev. Ed.) § 1338; Restatement: Contracts, §§ 329 and 333. The plaintiff has the right to recover losses which would not have occurred had the agreement been performed. From these must be deducted any saving to the plaintiff due to the nonperformance of the agreement to install the air-conditioning system. The plaintiff, however, may not recover unforeseen elements of damages, but only such as flow according to common understanding as the natural and probable consequences of the breach and such as may be presumed to have been in the contemplation of the parties at the time the lease was executed. Bucholz v. Green Bros. Co., 1930, 272 Mass. 49, 172 N.E. 101. "Damages are recoverable for losses caused * * * by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Restatement: Contracts, § 331(1). "The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his loss; nor does it mean that he cannot get damages unless he proves the exact amount of his harm." Id., Comment (a). "Doubts are generally resolved against the party committing the breach of contract." Id., Comment (c). "It is no exoneration to the defendant that his misconduct, which has made inquiry as to the quantum of harm necessary, renders that inquiry difficult. * * * The best the law can do is to award approximate compensation." Emerson v. Pacific Coast & Norway Packing Co., 96 Minn. 1, 8, 104 N.W. 573, 576, 1 L.R.A.; N.S., 445; see Williston on Contracts (Rev. Ed.) § 1346. Accordingly, the plaintiff is entitled to recover $2,720 as the estimated net loss it sustained from reduced patronage during the period from May 1 to August 4, 1959. The plaintiff is also entitled to recover $2,311, being the cost of installing a new marquee with neon lighting and removable lettering in accordance with the terms of the lease. No damages are allowed for the expenditures made by the plaintiff for washing and painting the interior of the theatre, for replacing worn carpeting, for making repairs and alterations in the lobby, for repairing and recovering damaged seats, and for the construction of the new concession stand, since on all the evidence it is not possible to estimate even approximately the probable amount of ·such damages. Thus, the total sum recoverable by the plaintiff for its expenditures and net losses is $5,031.

Since the plaintiff was relieved by the constructive eviction from its liability to pay rent under the lease, Gateway is not entitled to recover on its counterclaim. The plaintiff, however, did not abandon the premises within a reasonable time after it began its suit in equity in the Superior Court, when it indicated its election to treat Gateway's default as a constructive eviction. Gateway is therefore entitled on equitable grounds to a credit of the fair value of the plaintiff's occupation of the premises for the months of January, February, and March, 1960, which has been calculated above to be $2,316.28. Charles E. Burt, Inc. v. Seven Grand Corp., supra. This sum will be deducted from the amount of the compensatory damages awarded to the plaintiff, leaving a balance of $2,714.72 owing to the plaintiff in addition to the $7,500 still being held by Gateway as rent security.

Gateway's attempt in its third-party complaint to have Valley held responsible in whole or in part for the consequences of Gateway's own default cannot succeed. The unauthorized insertion of the completion date by Gateway was a material alteration of the terms of the proposed agreement of June 4, 1959, which prevented it from becoming a contract between the parties. Vickery v. Ritchie, 1909, 202 Mass. 247, 88 N.E. 835, 26 L.R.A.,N.S., 810, and Id., 1911, 207 Mass. 318, 93 N.E. 578; Williston on Contracts (Rev. Ed.) §§ 1908 and 1909. Valley never agreed to complete the installation on or before June 22, 1959, or by any other date. Valley never became legally bound to complete the installation in less time than was reasonable in the circumstances. Since Valley fully performed its obligation in this respect, there is no basis for holding it liable to Gateway.

In Civil Action No. 59–680–J, commenced as an action at law in the Massachusetts Superior Court, judgment will be entered,

a) dismissing the plaintiff's complaint without prejudice to the judgment that is to be entered in Civil Action No. 59–681–J, and without costs;

b) dismissing the defendant Gateway's counterclaim without costs; and

c) dismissing the defendant Gateway's third-party complaint without costs.

In Civil Action No. 59–681–J, commenced as a suit in equity in the Massachusetts Superior Court, judgment will be entered,

a) declaring that the defendant Gateway's failure to install air conditioning constituted a constructive eviction of the plaintiff and that the plaintiff is excused from further performance of its obligations under the lease;

b) permanently enjoining the defendant Gateway from enforcing or attempting to enforce performance of the lease or any of its terms against the plaintiff;

c) ordering the defendant Gateway to repay to the plaintiff the amount of $7,500 now being held by the defendant Gateway as rent security under the lease;

d) ordering the defendant Gateway to pay the plaintiff the amount of $2,714.72 as compensatory damages;

e) dismissing the defendant Gateway's counterclaim against the plaintiff; and

f) dismissing the defendant Gateway's third-party complaint against Valley.

In Civil Action No. 59–681–J, the plaintiff and Valley shall have their respective costs against Gateway.